[Cite as *State v. Moran*, 2012-Ohio-2237.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. No. 11CA010011 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| MIGUEL A. MORAN | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No. 10CR080887 |

DECISION AND JOURNAL ENTRY

Dated: May 21, 2012

BELFANCE, Judge.

{¶1} Miguel Moran appeals his convictions for rape, aggravated burglary, domestic violence, and aggravated trespass. For the reasons set forth below, we affirm.

I.

{¶2} J.R. burst into her neighbor's apartment and asked to use her phone to call the police. Officer Efrain Torres arrived on the scene and observed that the window on the rear door to J.R.'s apartment had been broken. Officer Torres spoke with J.R., and she told him that her ex-boyfriend, Mr. Moran, had broken into her apartment and physically assaulted her. When Officer Torres asked if she had been sexually assaulted, J.R. cried and did not answer. When speaking to Detective Dennis Moskal days after the incident, J.R. denied being sexually assaulted. A preliminary hearing was held a few weeks later. At that hearing, J.R. testified under oath and, for the first time, said that Mr. Moran had raped her.

{¶3} A jury found Mr. Moran guilty of rape, aggravated, burglary, domestic violence, and aggravated trespass, and the trial court sentenced him to an aggregate term of nine years in prison. Mr. Moran has appealed, raising four assignments of error for review.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED TO THE DETRIMENT OF APPELLANT WHEN IT RULED AGAINST APPELLANT'S MOTION FOR ACQUITTAL AS THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION.

{¶4} Mr. Moran argues in his first assignment of error that the State failed to present sufficient evidence that would support a conviction for rape. Mr. Moran does not address his convictions for aggravated burglary, domestic violence, or aggravated trespass, and, therefore, we confine our discussion to his conviction for rape. *See* App.R. 16(A)(7).

{¶5} "We review a denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence." *State v. Frashuer*, 9th Dist. No. 24769, 2010–Ohio–634, ¶ 33. "Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo." *State v. Williams*, 9th Dist. No. 24731, 2009–Ohio–6955, ¶ 18, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶6} The jury found Mr. Moran guilty of violating R.C. 2907.02(A)(2), which provides that "[n]o person shall engage in sexual conduct with another when the offender purposely

compels the other person to submit by force or threat of force." Sexual conduct includes "vaginal intercourse between a male and female * * * and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A). "Penetration, however slight, is sufficient to complete vaginal or anal intercourse." *Id*.

{¶7} J.R. testified that she had dated Mr. Moran for approximately three years and that they had lived together for a time. However, at the time of incident, they were no longer dating. On the morning of the incident, Mr. Moran woke J.R. by pounding on the door of her apartment. According to J.R., Mr. Moran claimed that he needed his birth certificate and social security card for an interview.

{¶8} J.R. testified that she was scared and told Mr. Moran that his items were in her car, not her apartment. According to J.R., she told Mr. Moran that, if he drove his car a distance away from her home, she would go to her car, get his things, and put them at the back door for him to pick up. J.R. testified that she asked Mr. Moran to do this because she did not trust him. Mr. Moran drove away, and J.R. went outside to her car.

{¶9} According to J.R., while she was getting Mr. Moran's things from her car, Mr. Moran drove past her. She ran into her apartment and shut the door, but Mr. Moran broke the glass with his elbow. When J.R. saw that Mr. Moran was going to unlock the door, she ran to try to get out the front door. Before she could reach the front door, however, Mr. Moran caught her from behind and pushed her onto her sofa.

{¶10} J.R. testified that, after Mr. Moran pushed her onto the sofa, he began to threaten her, saying that he had heard she had been with another man and that he was going to hit her. J.R. urinated on herself because she was so frightened. She told Mr. Moran that she had not been

having sex with anyone, but he remained angry. He told her to go upstairs and take a shower. She said she did not want to, but he told her to go upstairs and pushed her towards the stairs. When she resisted, he threw her against a wall.

{¶11} According to J.R., Mr. Moran pushed her upstairs and into the bathroom. J.R. shut the bathroom door and pretended to take a shower. When she opened the door, she saw Mr. Moran looking around in a room. He saw that she still had her clothes on and told her to get in the shower. He also told her to leave the bathroom door open.

{¶12} J.R. got in the shower, and Mr. Moran joined her. Mr. Moran ran his hands over her back and buttocks. According to J.R., she cried throughout the shower. Eventually, Mr. Moran told J.R. to go into her bedroom. She said no, and he yelled at her to go in the bedroom. J.R. threatened to scream and alert her sister-in-law who lived next door. However, Mr. Moran responded that J.R.'s sister-in-law was not home and that he had already closed J.R.'s bedroom window.

{¶13} J.R. testified that she looked at her purse, which contained mace, but Mr. Moran saw her and knocked the purse over. She tried to run out her bedroom door, but Mr. Moran slammed it shut. J.R. then tried to get around the bed, pleading with Mr. Moran, "[P]lease * * * don't do this." Mr. Moran grabbed her, put her in her bed, and asked again if she had had sex with any one. While Mr. Moran asked her that, he was grabbing J.R.'s jaw.

{¶14} J.R. denied having sex with anyone, and Mr. Moran told her that "he was going to check." Mr. Moran took some lubricant from J.R.'s vanity cabinet, put it on his finger, and inserted his finger into her vagina. Mr. Moran then penetrated J.R. with his penis. J.R. testified that she "kept telling [Mr. Moran] no, crying, begging, whatever." Eventually, Mr. Moran got up, and J.R. saw blood and semen on the towel that she was laying on.

{¶15} Mr. Moran asked J.R. where her phone was, saying that he wanted to go through her phone and that, if he found a man's name, he was going to hurt her. J.R. told Mr. Moran that her phone was in the next room and, when he left to go look, she grabbed her phone and took out the battery. When Mr. Moran returned, she gave him the phone and told him that the battery was dead. Mr. Moran said he had a charger in his car and left to go get it. J.R. testified that she went in the bathroom and cleaned her vagina. She also got dressed. Mr. Moran returned with a charger and plugged J.R.'s phone in. J.R. took the opportunity to run out her back door and into the home of her neighbor Barbara Pitts.

{¶16} J.R. asked to call the police, which Ms. Pitts allowed her to do. While J.R. was on the phone with the police, she saw Mr. Moran slowly drive past the front of Ms. Pitts' home. The police eventually came, and J.R. told the officers that Mr. Moran had broken into her home and had pushed her around. She did not tell them that he had sexually assaulted her because she was "embarrassed." She also did not want her brother to learn of the assault because she feared he would retaliate against Mr. Moran, getting in trouble as a result.

{¶17} Mr. Moran argues that there was insufficient evidence to convict him of rape because J.R.'s testimony was not credible. However, when reviewing the sufficiency of the evidence, this Court views the evidence in the light most favorable to the State. J.R. testified that Mr. Moran forced her to engage in vaginal intercourse with him and that he digitally penetrated her without her permission. Thus, there was sufficient evidence to allow the jury to find that Mr. Moran violated R.C. 2907.02(A)(2).

{¶18} Mr. Moran's first assignment of error is overruled.

ASSIGNMENT OF ERROR II

THE JURY LOST ITS WAY WHEN FINDING APPELLANT GUILTY OF THE CHARGES IN THE CASE AT BAR AS THE QUALITY OF THE EVIDENCE DID NOT MEET THE BURDEN OF PROOF AND THE JURY DID NOT CONSIDER THE WEIGHT OF THE EVIDENCE AND THEREFORE THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶19} In Mr. Moran's second assignment of error, he argues that his convictions were against the manifest weight of the evidence. As he did in his first assignment of error, Mr. Moran confines his arguments to his conviction for rape, and we confine our analysis to that conviction as well. *See* App.R. 16(A)(7).

{¶20} In reviewing a challenge to the weight of the evidence, the appellate court:

[m]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶21} Mr. Moran argues that J.R.'s testimony was completely lacking in credibility because she continued to add new details to the events that occurred after she initially reported the incident to police. He also places particular emphasis on the fact that J.R did not immediately report the fact that she was sexually assaulted and denied any assault while speaking to Detective Moskal several days after the incident. While J.R. did not immediately report a sexual assault, two witnesses that saw her the day of the break-in reported that J.R. was very upset. Ms. Pitts testified that J.R. startled her when she ran in the back door looking to use Ms. Pitts' phone. According to Ms. Pitts, J.R. "seemed really upset." Officer Torres, a 19-year veteran of the Lorain Police Department, testified that he responded to J.R.'s 911 call. According to Officer Torres, when he spoke with J.R., "she was crying and she couldn't catch

her breath." Officer Torres asked J.R. if she had been sexually assaulted, but J.R. "started crying and she wouldn't answer." Officer Torres also corroborated some of J.R.'s testimony based on his own observations, noting that her hair was still damp when he spoke to her and that the window of the back door of J.R.'s apartment was broken when he arrived on the scene.

{¶22} Furthermore, Mr. Moran's counsel cross-examined J.R. thoroughly about the variations in her testimony, and, therefore, the jury was well aware of the fact that her testimony was different from what she told the police officers as well as her proffered reasons for failing to report the assault immediately. The jury was entitled to weigh all of her testimony and determine whether it found her to be credible.

{¶23} Mr. Moran also argues that the jury should have believed his alibi witnesses instead of J.R. He presented three alibi witnesses: Wilmarie Ventura, Justine Rivera, and Jason Rivera. However, while all three witnesses testified that Mr. Moran was in Sandusky on the day J.R. testified that he raped her, all three witnesses had a personal relationship to Mr. Moran. Mr. Rivera is Mr. Moran's half-brother, and Mrs. Rivera is Mr. Moran's sister-in-law. Furthermore, while Ms. Ventura was married to another man at the time of Mr. Moran's trial, she had been dating Mr. Moran on the day J.R. claimed that he raped her. The jury could have found the relationships of the alibi witnesses to Mr. Moran to undermine their credibility and ultimately accorded less weight to their testimony.

{¶24} Conversely, the portions of J.R.'s testimony that could be corroborated were corroborated by witnesses unrelated to her. J.R. also provided explanations for why she did not come forward earlier with her accusation of rape, citing her own embarrassment and fear that her brother would retaliate against Mr. Moran. After a thorough and independent review of the record, we cannot say that the jury's resolution of the credibility of the witnesses was

unreasonable or that this is the unique case where the jury lost its way and committed a manifest miscarriage of justice. Mr. Moran's second assignment of error is overruled.

ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED TO THE DETRIMENT OF APPELLANT IN DENYING APPELLANT'S MOTION FOR MISTRIAL.

{¶25} Mr. Moran argues in his third assignment of error that several of J.R.'s statements during her testimony were so prejudicial that the trial court should have declared a mistrial. We disagree.

{¶26} "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991), citing *Illinois v. Somerville*, 410 U.S. 458, 462-463 (1973) and *Arizona v. Washington*, 434 U.S. 497, 505-506 (1978). "The essential inquiry on a motion for mistrial is whether the substantial rights of the accused are adversely affected. Great deference is afforded to a trial court's decision regarding a motion for mistrial. Accordingly, this Court reviews the denial of a motion for mistrial for an abuse of discretion." (Internal citations, alterations, and quotations omitted.) *State v. Howes*, 9th Dist. No. 24665, 2010–Ohio–421, ¶ 11. An abuse of discretion implies that the trial court's attitude was "unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶27} Mr. Moran points to several instances during J.R.'s testimony which his counsel did not object to or which were occasioned in response to questions his counsel asked during cross-examination of J.R. On three occasions during her testimony, J.R. refrained from giving more specific testimony. The first time was when the prosecutor asked her when she noticed that Mr. Moran had driven up next to her while she was trying to get his things out of her car. She testified, "[I]t happened so fast. * * * I was trying to get [his things] quick and give [them] to

him so that I can just go inside because I'm—well, I'm not allowed to mention the reasons why[.]" Later, when Mr. Moran's counsel asked J.R. whether she tried to stop Mr. Moran from touching her in the shower, she responded, "* * * I tried before. I mean, I know I'm not allowed to mention things that happened before. I know if I tried to fight him off, he would do something because he [had] done it before." On redirect, the prosecutor asked J.R. what the content of some voicemails Mr. Moran had left her was, and she replied, "Well, some of them have to do because of, like I said before, that I'm not allowed to mention."

{¶28} Mr. Moran argues that this testimony was unfairly prejudicial to him and warranted the trial court granting him a mistrial. However, J.R.'s responses to the prosecutor's questions do not give any indication as to what the incident J.R. could not mention involved. While her statements on cross-examination that she would not fight off Mr. Moran because "he would do something" and that "he [had] done it before[]" certainly imply some prior volatility in the past relationship, Mr. Moran's counsel invited the response by questioning why J.R. did not attempt to fight Mr. Moran off. Notably, Mr. Moran never objected to J.R.'s testimony or asked to strike her response on cross-examination, instead waiting until the State rested its case to request a mistrial.

{¶29} Mr. Moran also argues that he was entitled to a mistrial because J.R.'s landlord, Fred Smith, testified that, when he saw the rear door at J.R.'s apartment was broken, he was upset that he had to fix it again. Mr. Smith never mentioned Mr. Moran during his testimony or gave any indication as to how the door had been broken before.

{¶30} Upon review of the record, we cannot say that a fair trial was not possible in light of the testimony. On cross-examination, Mr. Moran invited J.R.'s testimony by asking a question that implied that she must be lying about the assault because she made no attempt to

fight Mr. Moran off in the shower. Furthermore, J.R.'s testimony on direct and redirect did not describe any particular event or prior act. Moreover, even if the jury could reasonably infer from the testimony that something unpleasant had happened in the past, J.R. had already provided other testimony which demonstrated that she was afraid of Mr. Moran and from which a jury could logically infer was based upon her past interactions with Mr. Moran. Regarding Mr. Smith's testimony, he did not imply in any way that Mr. Moran had previously broken the door on J.R.'s apartment; rather, he testified that the door had previously been broken and that he had fixed it prior to the day in question, which supported J.R.'s testimony that the door had been broken that day. Based on our review of the testimony and the evidence at the trial, we cannot say the trial court abused its discretion when it denied Mr. Moran's motion for a mistrial as his substantial rights were not affected. His third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED TO THE DETRIMENT OF APPELLANT BY ALLOWING WITNESSES TO TESTIFY THAT THEY BELIEVED THE TESTIMONY OF THE VICTIM AND FURTHER THAT THEY KNEW THE WITNESS HAD BEEN SEXUALLY ASSAULTED AT THE TIME SHE GAVE HER INITIAL REPORT EVEN THOUGH SHE HAD NOT TOLD POLICE THAT SHE HAD NOT BEEN SEXUALLY ASSAULTED.

{¶31} Mr. Moran argues in his fourth assignment of error that the trial court committed plain error when it allowed certain testimony from Officer Torres and Detective Moskal that impermissibly bolstered the credibility of J.R. We disagree.

{¶32} To establish plain error,

"[f]irst, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings. * * * Third, the error must have affected 'substantial rights[]' [to the extent that it] * * * affected the outcome of the trial."

*State v. Hardges*, 9th Dist. No. 24175, 2008–Ohio–5567, ¶ 9, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). However, "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

**{¶33}** Mr. Moran initially challenges a statement by Officer Torres that, based on her reaction to a question he asked her, he believed J.R. had been the victim of sexual assault.[1] Because Mr. Moran did not object to this testimony at trial, he has forfeited all but plain error on appeal. During the direct examination of Officer Torres, the following exchange occurred:

[Prosecutor]: [W]hen you went back to speak with [J.R.] again, did you have a specific purpose in doing that?

[Officer Torres]: Yes, I did.

[Prosecutor]: Can you explain to the jury what your specific purpose in doing that [wa]s?

[Officer Torres]: I wanted to know if she would tell me if she was a victim of a sexual assault.

[Prosecutor]: Okay. So that was your purpose, correct?

[Officer Torres]: Yes.

[Prosecutor]: Did you ask her a question in line with that purpose?

[Officer Torres]: Yes.

[Prosecutor]: What did you ask her? Please explain to the jury.

[Officer Torres]: I was pretty direct. I told her had some suspicions and I asked her if she was a victim of a sexual assault.

[Prosecutor]: And, again, we don't want to hear what anybody else said, but can you please describe her reaction to that question?

[Officer Torres]: She started crying and she wouldn't answer.

---

[1] Mr. Moran does cite a second portion of Officer Torres' testimony, but the reference to Officer Torres' "hunch" about the sexual assault is made by the prosecutor and was not testimony.

[Prosecutor]: Okay. What is your response when you observe this? What are you thinking as a police officer?

[Officer Torres]: That she was a victim of a sexual assault.

[Prosecutor]: So, if that's what your conclusion is, what did you do to follow that up, if anything?

[Officer Torres]: I—it appeared that she was uncomfortable speaking with me, so I told her that if she was indeed a victim of a sexual assault, that she should go to the Nord Center, which has a SANE unit where they gather evidence for rapes, and she should go there if she was a victim. Or, if she changed her mind, she could later contact the police again to speak with somebody.

**{¶34}** Indirect attempts to bolster the credibility of a witness are improper. *See State ex rel. Wise v. Chand*, 21 Ohio St.2d 113, 119 (1970) ("In a jury trial, the credibility of the witness is a question solely within the province of the jury."). However, assuming that some of Officer Torres' testimony was improper, when viewed in the context of all of the testimony, we cannot say that its inclusion affected the outcome of the trial. When Mr. Moran's counsel cross-examined J.R., he focused on the fact that J.R. did not immediately report a sexual assault, essentially implying that she was lying at trial. Within this context, the jury's assessment of J.R's credibility as to why she declined to report the assault was a central issue for the jury. However, Officer Torres could properly testify that he observed J.R. cry when he asked whether she had been sexually assaulted. He could also testify that, after observing J.R.'s reaction to his question, that he told her she could contact the police if she changed her mind or go to the NORD center. Even without asking Officer Torres about his subjective interpretation of J.R.'s reaction, the jury could reasonably infer that J.R. began to cry because she had been sexually assaulted but did not wish to disclose it.

**{¶35}** Mr. Moran also directs our attention to three portions of Detective Moskal's testimony. However, Mr. Moran's counsel objected to the testimony each time, and the trial court sustained his objections. On two occasions, the trial court specifically instructed the jury to

disregard Detective Moskal's testimony. A jury is presumed to follow the court's instructions, and Mr. Moran has not made any argument that the jury disregarded the trial court's instructions in this case. *See State v. Garner*, 74 Ohio St.3d 49, 59 (1995).

{¶36} Accordingly, we cannot say that the alleged error in the admission of Officer Torres' interpretation of J.R.'s behavior rose to the level of plain error. Mr. Moran's fourth assignment of error is overruled.

## III.

{¶37} Mr. Moran's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

 

_____

EVE V. BELFANCE
FOR THE COURT

WHITMORE, P. J.
CARR, J.
CONCUR.

APPEARANCES:

KENNETH N. ORTNER, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and MARY R. SLANCZKA, Assistant Prosecuting Attorney, for Appellee.